(C. D. 2176)

FIRTH STERLING, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 11, 1960)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Richard F. Weeks* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff* and *Sheila N. Ziff*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action presents a question of law for our solution, there being no dispute concerning the salient facts of the case.

An importation invoiced as "Artificial tungsten scheelite concentrates containing 75.25% $WO_3$," was classified by the collector of customs as a compound of tungsten, as provided in paragraph 302(g) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 302(g)), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and duty was imposed thereon at the rate of 42 cents per pound on the tungsten content and 20 per centum ad valorem.

Plaintiff claims by its protest that the commodity should be classified as a tungsten concentrate and subjected to duty in paragraph 302(c) of said act (19 U.S.C. § 1001, par. 302(c)) at the rate of 50 cents per pound on the metallic tungsten content.

The statutes are here set forth:

Paragraph 302(g), as modified, *supra*:

Tungstic acid, and all other compounds of tungsten, not specially provided for_____ 42¢ per lb. on the tungsten contained therein and 20% ad val.

Paragraph 302(c):

Tungsten ore or concentrates, 50 cents per pound on the metallic tungsten contained therein.

As will be developed later in this opinion, the production of the subject merchandise involves both mechanical and chemical treatment. The defendant contends that a concentrate is something derived from an ore by physical changes only. Therefore, the basic question for our determination is whether the fact that the chemical reaction entering into the production of the merchandise in controversy precludes the article from classification as a tungsten concentrate.

Adversary parties have stipulated and agreed to the method by which the merchandise under consideration was produced (exhibit 1), from which we quote the pertinent text:

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that the merchandise the subject of the above protest was produced by the following method of production: Crude low grade scheelite ore containing calcium tungstate equivalent to 2 to 10% $WO_3$ is ground in a ball mill to a fineness of 100 mesh per square inch. The ground ore is then concentrated by the use of a magnetic separator and by flotation in oils to remove iron and other impurities. It is then roasted in a rotary furnace to remove sulfur and arsenic. At other times, depending upon market conditions, low grade scheelite tungsten concentrates containing calcium tungstate equivalent to approximately 20% $WO_3$ are used instead of the roasted concentrate. Either the crude low grade scheelite ore, ground and concentrated by magnetic

separator and by flotation in oils and roasted, as previously described, or the secondary scheelite tungsten concentrates are then mixed with soda and the mixture is then calcined in a rotary furnace. The calcined product is then leached with water to obtain sodium wolframite liquor. Lime is then added to the liquor causing calcium tungstate to precipitate out.. The calcium tungstate is then separated and dried to remove the water. Most of the impurities not previously removed by magnetic separation, flotation in oils and roasting, or in the preparation of the low grade concentrates, are in the residue from the leaching process in obtaining sodium wolframite liquor. The calcium tungstate, together with any impurities not removed in the leaching process, is the imported artificial scheelite tungsten concentrates.

In addition to the stipulation quoted above, four witnesses testified, all of whom were called by the plaintiff, as follows:

Herman R. Huemme, secretary-treasurer of plaintiff company, which is in the business of tool steels and tungsten carbides, had been with the company for 42 years and was intimately familiar with scheelite and tungsten concentrates. He stated that the process of concentration is both mechanical and chemical.

Frank A. Marth, a former employee of plaintiff, a metallurgist experienced in the concentration of low-grade ores into synthetic scheelite concentrates and the processing of tungsten.

Arthur Linz, a technical consultant in mineral benefication or the preparation of minerals—his experience with tungsten and its products began in 1922.

Eugene R. Pickrell, attorney for plaintiff, who was called to identify a communication from the Treasury Department, Bureau of Customs, expressing the opinion that certain merchandise, designated as artificial tungsten scheelite, artificial tungsten scheelite concentrates (synthetic scheelite), and synthetic tungsten ore concentrates (scheelite), is classifiable in paragraph 302(c) of the Tariff Act of 1930 as tungsten concentrates.

All of the witnesses were well informed and highly qualified to testify within the area of their specific fields of operation.

It is clear from the agreed facts in the stipulation and from the testimony of the witnesses that, in the production of the merchandise in controversy, both physical and chemical changes of a substantial nature occurred. As a matter of fact, plaintiff, in its brief, states:

The controversy whether the resultant product is or is not a concentrate revolves about the fact that a chemical reaction has participated in the production of the imported merchandise. * * *

Plaintiff's witness, Herman R. Huemme, also admitted that the process of concentration of the subject merchandise is both mechanical and chemical.

That a substantial advantage results from the chemical reaction is evidenced by the fact that it results in recovery of a greatly increased percentage of tungsten.

Since it is clear from the record evidence, and is not disputed, that, in the production of the subject merchandise from the original ore, both physical and chemical changes have occurred, the Government contends that the importation in controversy is a compound of tungsten rather than a tungsten concentrate. This contention is based primarily upon the reasoning and judgment of our appellate court in *United States* v. *C. J. Tower & Sons*, 43 C.C.P.A. (Customs) 49, C.A.D. 608. That case involved importations of stabilized zirconium oxide which were produced pursuant to a patented process. In the treatment of the original ore, physical as well as chemical changes were involved. In the course of its opinion in that case, the court observed:

The witnesses for the importer testified that the process was a concentration and that the merchandise in each of the entries was a concentrate, basing their answers on the fact that such merchandise contained a substantially higher percentage of the desired material, zirconium oxide, than the original ore, and on the assertion that this zirconium oxide was unchanged chemically from that in the original ore. However, whether or not there was any change in the zirconium oxide itself, there is no dispute that the process which resulted in the alleged concentration of that substance did involve a chemical change, such change being an indispensable part of the process.

The facts of the present case closely parallel those above quoted. There, the Government contended that ore concentration processes, properly speaking, are limited to physical separation of ingredients only and that any process which depends upon chemical changes is not a concentration but a metallurgical process. The same contention is made here.

The court then quoted from Webster's New International Dictionary (1939) the definition of the noun "concentrate":

Concentrate n. (a) The product of dressing ore, consisting of finely ground minerals and containing the valuable ore.

The court noted that the definition depended upon the meaning of "ore dressing," which is defined in the same dictionary as follows:

Ore dressing. Treatment of ore involving physical, not chemical, change, as crushing, concentrating, sampling, etc.

Based upon those definitions, the court went on in positive terms to say—"From those definitions it is clear that a concentrate must be the result of physical changes only."

The court further referred to the Columbia Encyclopedia (1950), page 1267, which describes several mechanical methods of concentration, stating that "The general term for the treatment of an ore by heat is *smelting*." [Italics quoted.] Reference was also made to the case of *State* v. *Northwest Magnesite Co.*, 182 Pacific (2d) 642, wherein the Supreme Court of Washington quoted with approval from page

1–01 of Taggart's Handbook of Mineral Dressing as being in accord with Webster's definitions, to the effect that a concentrate must be the product of a process which involves no substantial chemical change.

Notwithstanding the fact that chemical changes were an important phase in the production of the subject merchandise and fully aware of the impact of the *Tower* case, *supra*, plaintiff, with much show of reason, invites our attention to various extraneous circumstances which it is claimed justify the court in distinguishing the *Tower* case. In an effort to ascertain the legislative intent from the context of paragraph 302(g), reference is made to plaintiff's exhibit 3, letter from the Bureau of Customs of the United States Treasury Department, wherein reference is made to a statement by the Bureau of Mines of the United States Department of Interior "that synthetic scheelite statistics are included in the tungsten concentrate class." Plaintiff refers to other sources of information and concludes: "It therefore appears that the literature, the tungsten industry, the expert witnesses called by plaintiff herein, the United States Government including the Bureau of Customs, all recognize merchandise such as the instant as a tungsten concentrate."

If this were a case of first impression, the foregoing references indicative of congressional intent would be persuasive. However, our appellate court, in the *Tower* case, *supra*, has stated with emphasis that "a concentrate must be the result of physical changes only." That definition was clearly intended to reflect the common meaning of the term "concentrate," appearing in Webster's New International Dictionary, fortified by the definition in the Columbia Encyclopedia. The court was not confining itself to the definition of "zirconium concentrate" but to the term "concentrate" in its broader aspects.

Our appellate court many years ago held, in substance, that when a court of competent jurisdiction settles and judicially defines the common meaning of a term used in a statute, such adjudication becomes part of law and "will be adhered to until a legislative change in statute necessitates a change in meaning," *United States* v. *Ben Felsenthal & Co.*, 16 Ct. Cust. Appls. 15, T.D. 42713. See also *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C.C.P.A. (Customs) 146, T.D. 48009.

In the absence of competent proof of a commercial meaning differing from the common meaning of the term "concentrate," as that word has been judicially defined, and in view of the fact that the importation under consideration does not fall within that definition, we are constrained to overrule the protest on all grounds.

Judgment will issue accordingly.